Monique Ngo-Bonnici (SBN: 241315)
mbonnici@winston.com
**WINSTON & STRAWN LLP**
333 South Grand Avenue, 38th Floor
Los Angeles, CA  90071-1543
Telephone: (213) 615-1700
Facsimile: (213) 615-1750

Attorneys for Plaintiff
AGILE SOURCING PARTNERS, INC.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**EASTERN DIVISION**

| | |
|---|---|
| AGILE SOURCING PARTNERS, INC., <br><br> Plaintiff, <br><br> v. <br><br> SEAN DEMPSEY; and E2 CONSULTING ENGINEERS, INC., <br><br> Defendants, | Case No.  5:21-cv-00773 <br><br> **COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF** <br><br> 1. **MISAPPROPRIATION OF TRADE SECRETS (18 U.S.C. § 1836 ET SEQ.)** <br> 2. **BREACH OF CONTRACT** <br> 3. **INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS** <br> 4. **INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE** <br> 5. **NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE** <br> 6. **BREACH OF FIDUCIARY DUTY** <br> 7. **AIDING AND ABETTING BREACH OF FIDUCIARY DUTY** <br> 8. **BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING** <br> 9. **DEFAMATION** <br> 10. **UNFAIR COMPETITION (BUS. & PROF. CODE § 17200 ET SEQ.)** <br><br> **DEMAND FOR JURY TRIAL** |

1    Plaintiff Agile Sourcing Partners, Inc. ("Agile"), a California corporation, with
2  its principal place of business in Corona, California, brings this Complaint against
3  Defendants E2 Consulting Engineers, Inc. ("E2"), a California corporation with its
4  principal place of business in Emeryville, California, and Sean Dempsey ("Dempsey")
5  (collectively, "Defendants"), for damages and injunctive relief, and alleges as follows:

6                    **THE PARTIES**

7    1.    Plaintiff Agile is, and at all relevant times hereto was, a corporation
8  organized and existing under the laws of the State of California, with its principal place
9  of business in Corona, California. Agile is an industry-leading integrated and supply
10  chain solutions provider in the utility and utility infrastructure markets. Agile maintains
11  eight office locations in six different states: Somerset, New Jersey; Fairfax, Virginia;
12  Baltimore, Maryland; Naperville Illinois, Orlando, Florida; and San Diego and Corona,
13  California.

14    2.    Defendant E2 is, and at all relevant times hereto was, a corporation
15  organized and existing under the laws of the State of California with its principal place
16  of business located in Emeryville, California. Its services include engineering
17  consulting for utilities and utility-contractors. E2 maintains nine domestic offices in six
18  domestic states, and also has an office in Mumbai, India.

19    3.    Defendant Dempsey is an individual and resident of South Lake Tahoe,
20  California. He is Director of Business Development at E2 and is based out of E2's
21  Emeryville, California office.

22                **RELEVANT NON-PARTIES**

23    4.    Richard Phillips ("Phillips") serves as Senior Vice President of Utilities
24  (West Region) for E2, and, upon information and belief, is based out of E2's Aiken,
25  South Carolina office.

26                **JURISDICTION AND VENUE**

27    5.    This civil action contains claims for trade secret misappropriation arising
28  under the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836 *et seq*. The Court

1   therefore has jurisdiction over the subject matter of these claims pursuant to 18 U.S.C.
2   § 1836(c).

3        6.    This Court has supplemental jurisdiction over Agile's state law claims
4   pursuant to 28 U.S.C. §1367(a).

5        7.    This Court has personal jurisdiction over E2 because it has committed and
6   continues to commit acts of misappropriation and other tortious acts in this judicial
7   district by directing the illegal acts described herein, which give rise to the causes of
8   action asserted herein. This Court also has personal jurisdiction over E2 because it has
9   substantial, systematic, and continuous contacts within this judicial district. E2 has
10  multiple established places of business in the State of California and provides services
11  throughout the State of California, including in this judicial district.

12       8.    Dempsey is subject to the personal jurisdiction of this Court because he is
13  domiciled in the State of California.

14       9.    Venue is proper in this judicial district under the provisions of 28 U.S.C.
15  §1391(b)(1), because E2 is a resident of this judicial district pursuant to 28 U.S.C.
16  §1391(c)(2), and all defendants are residents of the State of California. Venue is also
17  proper in this judicial district under the provisions of 28 U.S.C. §1391(b)(2), because a
18  substantial part of the events or omissions giving rise to the claims occurred in this
19  judicial district, and, upon information and belief, a substantial part of the intellectual
20  property that is the subject of this action was exfiltrated from and/or resides on computer
21  servers and/or devices located in this judicial district.

22  **FACTUAL ALLEGATIONS**

23  **A. Agile and E2's businesses.**

24       10.    Agile is an industry-leading integrated and supply chain solutions provider
25  in the utility and utility infrastructure markets. It helps gas and electric utilities and
26  utility infrastructure companies improve their operational efficiencies and performance.
27  Among other things, Agile offers innovative supply chain services that enhance
28  efficiencies for the procurement phase of multi-million-dollar infrastructure projects

1  across North America.

2       11.  Agile operates in between the pre- and post-construction phases of these

3  infrastructure projects. During pre-construction, Agile ensures that all materials are

4  ready and delivered to the project site. It does so by analyzing the engineering plans and

5  design packages from engineers and contractors, determining the universe of necessary

6  materials, and acquiring all those materials through its manufacturer and distributor

7  relationships. Agile thus oversees and manages the physical materials needed for these

8  large-scale projects. But Agile also supplies labor and schedules contractors as needed.

9  And on the post-construction side, Agile supports physical site cleanup and post-project

10  accounting closeout services. Agile also offers spend and invoice management

11  services—something unique to it in the industry—and prepares performance indicator

12  reports for its projects.

13       12. E2 also supports gas and utility infrastructure projects—but up until

14  recently, from a different side. Historically, E2 has been an engineering company for

15  both contractors and utilities wherein it would design engineering work packages and

16  prepare as-built drawings and job-package close-outs. But it would not offer the above-

17  mentioned Agile supply chain and procurement related services like spend and invoice

18  management.  To that end, E2 has not competed with Agile. In fact, for years, Agile and

19  E2 worked together to provide distinct services for their mutual clients; they worked on

20  the same utility projects but independently mastered different phases.

21  **B. Dempsey was an Agile executive with unrestricted access to confidential**

22  **and proprietary information.**

23       13.  Dempsey joined Agile in April 2015 as a Senior Supply Chain Analyst. He

24  quickly rose through the ranks at Agile—first to Supply Chain Program Manager and

25  then to National Sales Manager in March 2018. As Agile's National Sales Manager,

26  Dempsey was an executive with substantial managerial and oversight responsibilities.

27       14.  As the National Sales Manager (and even in his earlier roles), Dempsey

28  had access to Agile's most important sensitive information, including confidential

1   business and customer strategies, pricing data, customer lists, strategic marketing
2   plans, cost reports and other financial data, contract proposals and bidding information,
3   referral sources, new product developments and proposed service offerings, training
4   and operations methods and manuals, employee performance and compensation
5   figures, and other highly valuable internal content that are the lifeblood of Agile's
6   business. He also had access to the technology and architecture behind Agile's
7   proprietary Portal, eCommerce website, and other technology.

8       15.   Not only did Dempsey have access to Agile's internal systems, but he also
9   regularly attended weekly management meetings, client meetings, and various other
10  high-level planning, sales, and strategy meetings. Through these means, he learned the
11  intimate details of Agile's business—from historical bids and existing proposals to
12  future business expansion plans, granular sales data, and training tactics. Collectively,
13  this gave Dempsey a comprehensive understanding of Agile's business and all of its
14  strengths, vulnerabilities, and practices.

15      16.   As a condition of his employment—and as required by all employees—
16  Dempsey signed a Confidential and Non-Disclosure Agreement ("Agreement"). (Ex.
17  1).[1]  Under the Agreement, Dempsey acknowledged that he "will have access to and
18  will participate in the development of … confidential or proprietary information and
19  trade secrets relating" to Agile's business. (*Id.* at § 1(a).) This "confidential and
20  proprietary information" includes current and prospective customer lists, referral
21  sources, financial statements, marketing plans, cost reports, contract proposals, bidding
22  information, new product developments, training and operations methods and manuals,
23  past and present product recipes, and "all other tangible and intangible property …
24  used in the business and operations of Agile but not made public." (*Id.*) It also includes

25  —————————————
26  [1] When Dempsey first joined Agile in 2015, he signed an initial non-disclosure
27  agreement with similar confidentiality obligations in addition to the one attached here.
    Dempsey also signed a P-share unit agreement that offered him equity in Agile if he
28  met certain requirements and that contained overlapping confidentiality obligations.

"confidential information relating to business operations, research and development, contracts and strategic plans of third parties with which Agile has or may be assessing." (*Id.*)

17.  The Agreement also contains an express non-disclosure requirement: "Either during or after the term of [his] employment with Agile, [Dempsey] shall not directly or indirectly disclose, use, or make known for [his] or another's benefit any Confidential Information."  And if Dempsey ever left Agile, the Agreement mandated that he "immediately return to Agile … (and will not keep in [his] possession, recreate or deliver to anyone else) all Confidential Information."  (*Id.* at § 1(d).)

18.  Agile requires these confidentiality agreements because the protected information and processes took considerable time and resources to develop, including through confidential discussions with existing and prospective clients. Collectively, Agile invested thousands of hours, over ten-plus years and significant sums of money developing its Portal, eCommerce website, and unique invoice and spend management programs.

19.  Agile enforces an employee handbook that has similar confidentiality obligations and requires non-disclosure agreements with both customers and suppliers. It also uses firewall protections, VPN connections, and folder security with a high level of encryption, and restricts access to its internal systems (it gives out only a small number of employee licenses). And it does not provide customers with source code for its applications and programs.

**C. <u>Agile and E2 team up to offer their separate skills to mutual clients.</u>**

20.  In 2020, Agile developed a proprietary Engineering-Procurement-Construction Support model ("EPC Model") whereby it would partner with an engineering firm, like E2, and a construction firm to offer clients a single "E-P-C" solution. The idea being that—through a single operation with three complementary arms—the EPC Model would be a one-stop solution for all engineering, procurement, and construction needs for utility infrastructure projects.

21.    In late 2020, Agile settled on two viable partners: E2 as the engineering firm another company as the construction firm. And in November 2020, the three firms met at E2's Los Angeles office to discuss a potential partnership. At the time, Dempsey was an Agile employee and played a key role in bringing Agile's EPC Model to life. Shortly thereafter, E2 partnered with Agile to pitch the EPC model to a mutual client – a natural gas distribution utility. And over the next few months, Agile, E2, and the construction firm met with that client four to five times to promote Agile's model— with Dempsey again taking an active role to promote the joint venture. During this time, Dempsey had unfettered access to Agile's confidential and proprietary information.

22.    At the time of these meetings and for as long as Dempsey was working for Agile, E2 did not offer any of the procurement or spend and invoice management services that the team pitched to the mutual client under the EPC Model.

**D. While still an Agile employee—Dempsey conspires with E2 to strip business and customers from Agile.**

23.    Upon information and belief, in or around January or February 2021, E2 approached Dempsey—while he was still an Agile employee—with an offer of employment to spearhead its new procurement services arm.

24.    While still employed by Agile, Dempsey set up meetings between E2 and certain Agile clients to compete for supply chain and procurement-related work. And in at least one instance at about the same time—again, while Dempsey was still an Agile executive—Dempsey both "ghost write" a termination letter on behalf of one of Agile's existing clients (a nationwide traffic safety and management firm that had contracts with Agile, including for infrastructure projects spanning across state lines) and prepared a replacement E2 contract for that same client that was nearly identical to the then-existing, confidential Agile contract. A forensics analysis found these documents on Dempsey's Agile-issued laptop. And soon after Dempsey's departure, that client terminated its contractual relationship with Agile with a letter almost

1    identical to the one that Dempsey "ghost wrote" for it.

2        **E.  Dempsey leaves Agile to join E2 and spearhead its procurement arm.**

3        25.    Dempsey tendered his resignation to Agile on March 5, 2021, informing

4    Agile that he planned to be a "stay-at-home dad." But Dempsey started working at E2

5    on April 5, 2021—just days after his final day at Agile on April 1, 2021.

6        26.    Because Dempsey informed Agile that he was resigning to be a "stay-at-

7    home dad", Agile allowed Dempsey to remain employed far longer than it otherwise

8    would have (thus giving him continued access to confidential information).

9        27.    Between the day Dempsey gave Agile his resignation letter and his last day

10   of employment with Agile, Dempsey attended several management and client

11   meetings, where he continued to gain access to Agile's confidential materials.

12       28.    On April 2, 2021, one day after Dempsey left his employ with Agile and

13   after Agile learned that Dempsey would not be a stay-at-home dad and instead would

14   be working for E2, Agile wrote to Dempsey reminding him of his continuing obligations

15   to Agile under the Agreement. Agile also wrote to E2 that same day detailing

16   Dempsey's obligations under the Agreement and expressing Agile's intent to enforce

17   the Agreement.

18       29.    On or about April 19, 2021, Agile hired a forensics team from FTI

19   Consulting to analyze Dempsey's Agile-issued laptop. The team uncovered that in his

20   last 30 days at Agile, Dempsey connected two external storage devices to his Agile-

21   issued laptop and transferred more than four gigabytes of Agile's confidential

22   information and thousands of documents to them. These transfers occurred on March 4,

23   5, 8, 9, 10, 11, 24, and 31.

24       30.    Among some of the documents and information Dempsey transferred to

25   these external devices were entire business development files, invoice management

26   proformas that set forth pricing strategy and profitability for specific projects,

27   equipment rental process diagrams that indicate customer spend habits and proprietary

28   work product setting forth customized ways for its clients to reduce costs, confidential

services agreements entered into between Agile and its clients, confidential agreements between Agile and its suppliers and vendors, business development meeting agendas, Agile's master client lists, cost reports, confidential client presentations, new product developments and proposed service offerings, confidential price and bidding quotations given to existing and prospective clients, contract proposals, and documents related to Agile's long range strategic plan for market penetration and business growth. Forensics also revealed that Dempsey took a folder titled "Portal Development."

31.     The information taken by Dempsey puts forth a playbook of Agile's supply chain and procurement operations, as well as its proprietary methods for pricing and strategic marketing for projects across North America. Dempsey did not return any of these external storage devices to Agile upon or after leaving Agile to work for E2, despite his obligation to do so under the Agreement.

32.     On March 8 and 9, 2021, Dempsey deleted 3,503 files and folders from his Agile OneDrive, totaling more than 5.91 gigabytes of data. These deleted files were largely related to Agile's business development efforts, strategic planning, pricing and sourcing information, and customer presentations and bids. Dempsey did this—in direct violation of his Agreement—after having been told by Agile to refrain from deleting anything so that his work could be transitioned to his replacement. Almost none of this could be recovered by Agile, even with help from forensic tools.

33.     Additionally, on March 31, 2021, just one day before he was to end his employment with Agile and lose access to Agile's IT systems, Dempsey ran the following two Google searches for "how to save emails" and "how to mass save emails from outlook." That same day he created a file folder on one of the external storage devices in question and moved several of his emails onto the drive.

34.     While Agile's investigation continues, it already has confirmed that Dempsey accessed Agile's: (1) confidential client portals; (2) proprietary folders and files relating to the core of its business operations and strategic planning; (3) customer bills of materials; (4) confidential presentations, bids and contracts, and other files.

35.     Forensics analysis shows that Dempsey invited Richard Phillips, E2's Senior Vice President of Utilities, to meet with him at least three times in March 2021. But Dempsey never disclosed these meetings to anyone at Agile. Specifically, a forensics analysis revealed that in March 2021, Dempsey sent Phillips an Outlook calendar invitation titled "technology review" meeting. Then, on March 16, Dempsey sent a calendar invite to Phillips and an employee of one of Agile's existing clients to discuss close-out work. But there was no reason for Phillips from E2 to be involved in these discussions given that the meeting was with an existing Agile client about work Agile was hired to do, and E2 was not involved in the project. And on another occasion, Dempsey sent Phillips a calendar invite for a meeting with four representatives from yet another Agile client. This meeting titled "Equipment Rental Program" was scheduled for March 18, 2021, and again, there was no reason for E2 to be involved on this Agile-specific project. The meeting invitation was originally sent on March 12, 2021 to only the Agile client team and Dempsey's personal email address. That same day though, Dempsey received a meeting acceptance from Phillips to his Agile email account, suggesting that Dempsey had forwarded the invite to Phillips from his personal account. These secret meetings are particularly alarming because Agile had been expanding its business with this particular client and had been presenting to it a spend management service over several months. And leading up to Dempsey's resignation, the client expressed intention to sign with Agile on these additional projects, but after Dempsey resigned, Agile's conversations with this client on the expanded projects ceased abruptly. Upon information and belief, that client is now in discussions with E2 for the same work that the client previously expressed intention to sign with Agile for.

36.     On April 9, 2021 (after Dempsey's formal start at E2), Agile discovered that in his final remaining days at Agile, Dempsey emailed confidential information from his company email account to his personal account in 13 separate instances, and some of those were also sent to Phillips. Forensics also discovered that Dempsey also took the bill of materials lists for one of Agile's clients on March 17, 2021 and went to

1   Agile suppliers and distributors to ask that they quote E2 directly for those materials,
2   presumably so that E2 could offer the same supply chain services that Agile offers.
3   Forensics showed that Phillips had received certain of these communications.

4        37.   On April 19, 2021, Agile wrote to Dempsey and E2 again asking that they
5   immediately cease using any confidential Agile information, return such information
6   immediately, and preserve any relevant evidence.  Agile also advised that it would not
7   hesitate to enforce its rights as necessary.

8        38.   E2 responded by letter two days later.  In the letter E2 "assures [Agile] that
9   [it] did not intentionally seek to obtain … any of Agile's business information" and
10  attaches a declaration from Dempsey admitting that "[a]fter my Agile employment
11  ended, I still had in my possession a laptop computer that Agile had issued to me and
12  that I used for work during my Agile employment."

13       39.   Dempsey did not return his Agile-issued laptop to Agile until nearly two
14  weeks after his last day of employment with Agile.

15       40.   While Dempsey's declaration states that he did not share any confidential
16  Agile data with E2 "after [his] Agile employment ended," it is noticeably silent on what
17  he did *while* still employed at Agile.

18       41.   Dempsey's declaration also admits that while employed at Agile, he
19  forwarded emails from his work account to his personal email account.  And again,
20  while Dempsey claims that he has now deleted these emails from his personal account,
21  he says nothing about what exactly they contained or who else he may have sent them
22  to.

23       42.   Dempsey's declaration also concedes that he "downloaded to a thumb
24  drive" various documents related to his work at Agile.

25   **F.  Since Dempsey joined E2, E2 now competes with Agile's procurement**
26        **business.**

27       43.   Based on information and belief, since Dempsey began working for it, E2
28  has begun to attempt to self-perform supply chain and procurement-related functions

(including on the EPC Model work that E2 pitched together with Agile to one of Agile's existing clients).

44.    Based on information and belief, E2 also targeted other existing Agile clients and promised them lower cost procurement functions to undercut Agile.

45.    Based on information and belief, Dempsey and E2 have engaged in a smear campaign to thwart Agile's prospective business opportunities. After beginning his employment with E2, Dempsey falsely informed at least one of Agile's existing clients that Agile is deceitfully withholding information from them and others about the recent loss of its diversity certification. But Agile has done no such thing.

46.    Agile operates in a tight niche industry and successful companies in this space must deliver quality services and materials while maintaining stellar reputations. This is particularly true because Agile's customers trust it with large amounts of proprietary data that they expect Agile will protect. It is thus important that Agile operates at the highest integrity with customers' and suppliers' data. So a smear campaign on Agile's integrity can have a lasting and tremendous impact in this service industry. Indeed, Agile's business relationships with the clients that Dempsey and E2 have published these false statements to are now in jeopardy as a result of their lies.

47.    Because of the actions of Dempsey and E2, Agile is now at risk of losing millions from prospective contracts and existing deals that Agile has already procured.

## FIRST CLAIM FOR RELIEF

**(Violation of the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836; against all Defendants)**

48.    Agile repeats and restates the allegations in the foregoing paragraphs as if fully set forth herein.

49.    As set forth above, Defendants have improperly acquired, remain in possession of, used, and disclosed certain confidential and proprietary information of Agile constituting "trade secrets" as defined by 18 U.S.C. § 1839(3). These trade secrets, including without limitation those specifically identified above, have been used

in and/or were intended for use in interstate and/or foreign commerce. Agile is the owner of such information.

50.    Agile has taken numerous, reasonable precautions to protect and to maintain the value of its trade secrets, including without limitation as set forth above. This information is integral to Agile's utility and utility infrastructure procurement business, and is the result of extensive, time-consuming and expensive internal research and development, as well as confidential discussions with clients and prospective clients.

51.    Agile's trade secrets derive actual or potential independent economic value from not being generally known to and not being readily ascertainable through proper means by any other person who can obtain economic value from the disclosure or use of the information. Specifically, the secrecy of the trade secrets protects Agile from replication of its know-how and business methodologies in the utility and utility infrastructure procurement industry, thus allowing it to provide unique and highly-valuable service offerings to clients located throughout North America and preventing strategic undercutting and replication by its competitors.

52.    Such proprietary, trade secret and confidential information is not accessible to the public and is not generally known within the trade or by special persons who are skilled in the trade, other than by those who are bound to maintain their secrecy and confidentiality.

53.    The trade secrets represent years of proprietary research, development, and investment by Agile. They were obtained and compiled over time by Agile employees using Agile resources and know-how.

54.    Defendants' improper acquisition and/or unauthorized use or disclosure violates the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.* (the "DTSA").

55.    Defendants knew that Dempsey had contractual and legal duties to refrain from disclosing or using for their benefits, or for the benefits of third parties, Agile's trade secrets. These duties arose from, among other things, Dempsey's duties set forth

1    in the Agreement with Agile, and federal and state law applicable to Dempsey and E2.

2         56.    Defendants knew, or had reason to know, that knowledge of the trade

3    secrets were derived through improper means, acquired under circumstances giving rise

4    to a duty to maintain its secrecy or limit the use of the trade secrets, or derived from or

5    through a person who owed a duty to the person seeking relief to maintain the secrecy

6    of the trade secrets or limit the use of the trade secrets.

7         57.    Defendants' acquisition of Agile's trade secrets through improper means

8    was not authorized by Agile.

9         58.    Defendants have improperly acquired, used, and/or disclosed Agile's trade

10    secrets with full knowledge that this information was acquired under circumstances

11    giving rise to a duty to maintain its secrecy or limit its use and was acquired by improper

12    means.

13         59.    Defendants' misappropriation and use of Agile's trade secrets was

14    intentional, knowing, willful, and oppressive.

15         60.    As a direct and proximate result of Defendants' unlawful, tortious conduct,

16    Agile has been damaged and Defendants have been unjustly enriched. This unjust

17    enrichment includes the value and profits attributed to the misappropriated information,

18    including amounts Defendants saved in research and development costs using the

19    misappropriated information and increased productivity from use of the

20    misappropriated information.

21         61.    Defendants' conduct constitutes willful and malicious misappropriation

22    within the meaning of the DTSA. In wrongfully and intentionally misappropriating

23    Agile's trade secrets as outlined above, Defendants have demonstrated specific intent

24    to cause substantial injury or harm to Agile. As such, Agile is entitled to an award of

25    exemplary and punitive damages as well as an award of its reasonable attorney's fees

26    pursuant to the DTSA.

27         62.    Unless Defendants are enjoined from misappropriating Agile's trade

28    secrets, Agile will suffer irreparable harm for which there is no adequate remedy at law.

1

## SECOND CLAIM FOR RELIEF

2

### (Breach of Contract; against Dempsey)

3      63.    Agile repeats and restates the allegations in the foregoing paragraphs as if

4    fully set forth herein.

5      64.    As a condition of his employment with Agile, Dempsey agreed to the terms

6    and conditions set forth in the Agreement, as described above.

7      65.    Dempsey accepted those terms and conditions through his acceptance and

8    continued employment with Agile, and by singing his acknowledgment of the terms and

9    conditions in the Agreement.

10     66.    Therefore, a valid and enforceable contract existed between Agile and

11   Dempsey.

12     67.    Agile performed its obligations.

13     68.    Dempsey has breached the provisions of the Agreement by the conduct

14   alleged herein, including, without limitation by: secretly working for E2 and against

15   Agile while still employed with Agile; steering Agile's business and business

16   opportunities away from Agile and directly to E2 to benefit E2 and weaken Agile;

17   misappropriating, disclosing, and using for his own and E2's benefit in competition

18   with and to the determined of Agile, valuable confidential and proprietary business

19   information of Agile that E2 would not have otherwise acquired; and other conduct

20   which is presently unknown but will be proven at trial.

21     69.    Agile has been damaged by the conduct in an amount to be proven at trial.

22     70.    As a proximate cause of Dempsey's conduct described above, Agile has

23   suffered and will continue to suffer, irreparable harm as this conduct interferes with

24   Agile's operations and business. The harm caused by Dempsey's conduct outweighs

25   any benefits that the conduct may have.

26     71.    Accordingly, Agile seeks damages and/or all other remedies available

27   under law.

28

1

2

**THIRD CLAIM FOR RELIEF**

**(Intentional Interference with Contractual Relations; against E2)**

3  72.  Agile repeats and restates the allegations in the foregoing paragraphs as if

4  fully set forth herein.

5  73.  As detailed above, Dempsey had a valid, enforceable contract with Agile,

6  in which he agreed to not take with him and return all Agile property and confidential

7  information upon termination of his employment with Agile—and in which he agreed

8  not to misappropriate Agile's trade secrets and other confidential and proprietary

9  information. (Ex. 1.)

10  74.  Upon information and belief, E2 was aware of the terms of Dempsey's

11  contract, including because (1) E2 is aware of the terms of standard employment

12  agreements for executives in the utility and utility infrastructure industries, (2) E2

13  entered into a Confidentiality Agreement with Agile in advance of its joint efforts with

14  Agile on certain projects and knows the significant measures Agile takes to ensure its

15  proprietary information is protected, and (3) Agile sent E2 several letters informing E2

16  of Dempsey's continuing obligations with regard to protecting Agile's confidential

17  information.

18  75.  Upon information and belief, E2 was also aware of Dempsey's legal duties

19  of loyalty that arose as a result of his status of National Sales Manager with Agile.

20  Having operated in the North America utility and utility infrastructure industry for

21  years, E2 would have had the basic familiarity with applicable legal requirements to

22  know that a National Sales Manager owes a duty of loyalty to the company where he

23  serves in that role (even in the absence of a contract) that would disallow him from

24  stealing trade secrets, and diverting business opportunities to competitors.

25  76.  Yet, as detailed above, E2 conspired with Dempsey to use Agile's

26  confidential information and trade secrets in order to divert business and business

27  opportunities away from Agile and to E2. And in doing so, encouraged Dempsey to

28  exfiltrate Agile's confidential information and trade secrets for E2's benefit, in direct

1  violation of Dempsey's contractual obligations to Agile.

2       77.    E2's actions as described herein prevented and hindered the performance

3  of Dempsey's contract.

4       78.    E2 intended these results and/or knew they were likely.

5       79.    As a direct and proximate result of E2's actions as described herein, Agile

6  has been damaged and continues to be damaged, including in the form of lost profits

7  resulting from the loss of current business and prospective business opportunities, in an

8  amount to be proven at trial.

9              **FOURTH CLAIM FOR RELIEF**

10  **(Intentional Interference with Prospective Economic Advantage; against all**

11                    **Defendants)**

12      80.    Agile repeats the allegations in the foregoing paragraphs as if fully set forth

13  herein.

14      81.    As described herein, Agile was in an economic relationship with the clients

15  and prospective clients described herein that had a probable future economic benefit or

16  advantage to Agile. Indeed, the clients in question had been in discussions with Agile

17  to perform services for those clients and/or were actively engaged on projects with

18  Agile, both inside and outside of California.

19      82.    Dempsey knew of these relationships. And E2 knew of these relationships,

20  having received knowledge of these relationships from Dempsey during the period he

21  remained employed by Agile but was already acting on behalf of E2, at E2's behest.

22      83.    Dempsey and E2 intentionally and wrongfully diverted these relationships

23  from Agile to E2, including by using Dempsey's position and access to Agile's

24  confidential information and trade secrets to divert these opportunities to E2, with full

25  knowledge that Dempsey had contractual and/or legal duties to Agile that made such

26  conduct wrongful and unlawful.

27      84.    Dempsey and E2's actions in this regard were carried out with the

28  knowledge that the interference was certain or substantially certain to occur as a result

of their actions, such that the clients and prospective clients in question would divert their business from E2 to Agile.

85.    Such disruption has in fact occurred, as the business opportunities described herein have been lost or are now in jeopardy as a result of the actions described herein. Upon information and belief, the client opportunities described herein, as well as others that Agile is not yet aware of, are now being transferred to E2.

86.    As a direct and proximate result of Dempsey and E2's wrongful conduct, Agile has been harmed and continues to be harmed, including in the form of lost present and future business and business opportunities, in an amount to be proven at trial.

87.    Dempsey and E2's conduct is malicious, oppressive, deceitful and/or constituted concealment of material facts known to it with the intent of thereby depriving Agile of property or legal rights or otherwise causing injury in conscious disregard of Agile's legal rights, to justify an award of exemplary and punitive damages.

## FIFTH CLAIM FOR RELIEF

### (Negligent Interference with Prospective Economic Advantage; against all Defendants)

88.    Agile repeats the allegations in the foregoing paragraphs as if fully set forth herein.

89.    As described herein, Agile was in an economic relationship with the clients and prospective clients described herein that had a probable future economic benefit or advantage to Agile. Indeed, the clients in question had been in discussions with Agile to perform services for those clients and/or were actively engaged on projects with Agile, both inside and outside of California.

90.    Dempsey knew or should have known of these relationships. And E2 knew or should have known of these relationships, having received knowledge of these relationships from Dempsey during the period he remained employed by Agile but was acting on behalf of E2, at E2's behest.

91.    Dempsey and E2 wrongfully diverted these relationships from Agile to E2,

by using Dempsey to divert these opportunities to E2, with full knowledge that
Dempsey had contractual and legal duties to Agile that made such conduct wrongful
and unlawful.

92.    Dempsey and E2 knew or should have known that their actions in this
regard would disrupt the economic relationship between Agile and the clients and
prospective clients in question, such that the clients and prospective clients in question
would divert their business from Agile to E2.

93.    Such disruption has in fact occurred, as the business opportunities
described herein have been lost or are now in jeopardy as a result of the actions
described herein. Upon information and belief, the client opportunities described herein,
as well as others that Agile is not yet aware of, are now being transferred to E2.

94.    As a direct and proximate result of Dempsey and E2's wrongful conduct,
Agile has been harmed and continues to be harmed, including in the form of lost present
and future business and business opportunities, in an amount to be proven at trial.

95.    Dempsey and E2's conduct in interfering with Agile's prospective
economic advantage is grossly negligent and reckless in its disregard of Agile's legal
rights, so as to justify an award of exemplary and punitive damages.

## SIXTH CLAIM FOR RELIEF

### (Breach of Fiduciary Duty; against Dempsey)

96.    Agile repeats the allegations in the foregoing paragraphs as if fully set forth
herein.

97.    During his employment with Agile, Dempsey, the National Sales Manager
at Agile, was a member of the "inner circle" of Agile. As detailed above, in this capacity
Dempsey had intimate knowledge of various confidential and trade secret information,
including inside knowledge of Agile's  customers, models, research, strategic plans and
proforma.

98.    Dempsey owed a fiduciary duty to Agile in that in his position as National
Sales Manager, he had discretionary management authority over Agile's products and

1    services as detailed above.

2        99.    Throughout the duration of his employment with Agile, Dempsey owed

3    Agile duties, including (1) to protect Agile's interests, (2) to refrain from doing anything

4    that would work injury to Agile or deprive it of opportunities; and (3) to refrain from

5    competing with Agile during his employment.

6        100.    Dempsey breached his fiduciary duty to Agile by the conduct described

7    above, including, by performing work for E2, diverting current and prospective business

8    from Agile to E2, and exfiltrating Agile confidential information and trade secrets for

9    the benefit of E2; all while still employed by Agile.

10        101.    As a direct and proximate result of Dempsey's conduct, Agile has been

11    damaged in an amount to be proven at trial (including without limitation present and

12    future lost profits).

13                    **SEVENTH CLAIM FOR RELIEF**

14            **(Aiding and Abetting Breach of Fiduciary Duty; against E2)**

15        102.    Agile repeats the allegations in the foregoing paragraphs as if fully set forth

16    herein.

17        103.    Dempsey owed duties of loyalty to Agile both under his contract, including

18    not to misappropriate trade secrets and other proprietary information, and not to divert

19    business opportunities during his employment with Agile.

20        104.    Upon information and belief, E2 was aware of Dempsey's legal duties of

21    loyalty that arose as a result of his status of National Sales Manager with Agile. Having

22    operated in the North America utility and utility infrastructure industry for years, E2

23    would have had the basic familiarity with applicable legal requirements to know that a

24    National Sales Manager owes a duty of loyalty and other fiduciary duties to the

25    company where he serves in that role (even in the absence of a contract) that would

26    disallow him from stealing trade secrets, and diverting business opportunities to

27    competitors.

28        105.    E2 knowingly and intentionally interfered with and induced Dempsey to

1  breach his duty of loyalty, as described herein.

2      106.   As a direct and proximate result of E2's conduct, Agile has been damaged

3  and continues to be damaged, including in the form of lost profits resulting from the

4  loss of clients, in an amount to be proven at trial.

5  **EIGHTH CLAIM FOR RELIEF**

6  **(Breach of Implied Covenant of Good Faith and Fair Dealing; against Dempsey)**

7      107.   Agile repeats the allegations in the foregoing paragraphs as if fully set forth

8  herein.

9      108.   California law implies a covenant of food faith and fair dealing in all

10  contracts between parties entered into in the State of California. This implied covenant

11  requires each contracting party to refrain from doing anything to unfairly interfere with

12  the right of the other party to receive the benefits of the agreement.

13      109.   As a condition of his employment with Agile, Dempsey agreed to the terms

14  and conditions set forth in the Agreement, as described above.

15      110.   Dempsey accepted those terms and conditions through his acceptance and

16  continued employment with Agile, and by singing his acknowledgment of the terms and

17  conditions in the Agreement.

18      111.   Therefore, a valid and enforceable contract existed between Agile and

19  Dempsey.

20      112.   Agile performed its obligations.

21      113.   Dempsey has breached the provisions of the Agreement by the conduct

22  alleged herein, including, without limitation by: secretly working for E2 and against

23  Agile while still employed with Agile; steering Agile's business and business

24  opportunities away from Agile and directly to E2 to benefit E2 and weaken Agile;

25  converting, misappropriating, disclosing, and using for his own and E2's benefit in

26  competition with and to the determined of Agile, valuable confidential and proprietary

27  business information of Agile that E2 would not have otherwise acquired; and other

28  conduct which is presently unknown but will be proven at trial.

114.    Agile has been damaged by the conduct in an amount to be proven at trial.

115.    As a proximate cause of Dempsey's conduct described above, Agile has suffered and will continue to suffer, irreparable harm as this conduct interferes with Agile's operations and business. The harm caused by Dempsey's conduct outweighs any benefits that the conduct may have caused.

116.    Dempsey's conduct is malicious, oppressive, deceitful, and/or constituted concealment of material facts know to Dempsey with the intent of thereby depriving Agile of property or legal rights or otherwise causing injury, and was despicable conduct that subjected Agile to cruel and unjust hardship in conscious disregard of Agile's rights, so as to justify an award of exemplary and punitive damages.

## **NINTH CLAIM FOR RELIEF**

### **(Defamation; against Dempsey)**

117.    Agile repeats the allegations in the foregoing paragraphs as if fully set forth herein.

118.    Based on information and belief, Dempsey has made certain defamatory statements regarding Agile to third parties, including, but not limited to: falsely informing at least one of Agile's existing clients that Agile directed him to withhold information from them and others about Agile's diversity certification status.

119.    Agile is informed and believed that the persons to whom Dempsey made these statements reasonably understood that the statements were about Agile.

120.    Agile is informed and believed that the persons to whom Dempsey made these statements reasonably understood the statements to mean that Agile was intentionally concealing its diversity certification status from the persons' employers— current and/or prospective clients of Agile—to retain business using deceitful tactics.

121.    Agile is informed and believed and thereon alleges that Dempsey has made the foregoing statements with the specific intent to injure Agile and without any reasonable basis for believing the statements to be true, and, in fact, knowing the statements to be false.

122.   All statements are entirely false as they pertain to Agile and are defamatory, slanderous on their face, and expose Agile to contempt, disrepute, and distrust in the industry.

123.   Upon information and belief, the statements have been made verbally to multiple people.

124.   At least one publication of the false statements has been reported to Agile executives.

125.   Dempsey's wrongful conduct was a substantial factor in causing harm to Agile's reputation in the industry.

126.   Upon information and belief, Dempsey acted with malice, oppression, and fraud, entitling Agile to exemplary and punitive damages.

## TENTH CLAIM FOR RELIEF

### (Unfair Competition Under California Business & Professions Code § 17200; against all Defendants)

127.   Agile repeats the allegations in the foregoing paragraphs as if fully set forth herein.

128.   California Business & Professions Code § 17200 prohibits any "unlawful, unfair or fraudulent business act or practice."

129.   Defendants' business acts and practices as alleged herein constitute ongoing unlawful and unfair activity in violation of California's Unfair Competition Law ("UCL"), as codified in California Business and Professions Code § 17200 et seq.

130.   E2's business acts are unlawful and unfair because they induced Dempsey to breach his employment agreement and to breach his duty of loyalty to Agile. As discussed above, E2 and Dempsey's actions further diverted several of Agile's existing business and prospective business opportunities to E2 and constitute intentional interference with Agile's prospective economic advantage.

131.   Defendants' unlawful and unfair actions as described herein allowed E2 to effectively steal Agile's business, bypassing all the investment of time and resources

that Agile undertook to cultivate the business and business opportunities. This is the epitome of unfair competition, as it disincentives the very sort of investment that Agile undertook in the first place.

132. Furthermore, Defendants' conduct constitutes unlawful and unfair business acts or practices within the meaning of Cal. Bus. & Prof. Code § 17200 et seq. because Defendants orchestrated and carried out a course of conduct to disrupt, divert, and steal Agile's business by, for example and without limitation:

    a. Engaging in wrongful conduct that disrupted the economic relationships (both current and prospective) between Agile and its clients. Defendants knew of, or should have known of, the relationships, and (1) engaged in the wrongful conduct intentionally to disrupt the relationships; (2) engaged in the wrongful conduct knowing that disruption of the relationships was certain or substantially certain to occur; and/or (3) failed to act with reasonable care and should have known that the economic relationships would be disrupted if they failed to act with reasonable care. This wrongful conduct was a substantial factor in causing Agile's financial harm.

    b. Interfering with Agile's contractual relations with its employees and diverting its clients to E2;

    c. Inducing Dempsey to breach the terms of his Agreement and duties of loyalty to Agile by, among other things, diverting business opportunities to Agile while Dempsey remained employed by and under contract with Agile; and

    d. Other conduct which is presently unknown but will be proven at trial.

133. Agile has been harmed as a result of Defendants' unlawful and unfair business acts and practices. Agile is entitled (a) to recover restitution, including without limitation, all benefits that Defendants received as a result of their unlawful and unfair business acts and practices, and (b) an injunction restraining Defendants from engaging in further acts of unfair competition.

1        **PRAYER FOR RELIEF**

2        WHEREFORE, Agile demands judgment as follows:

3        a.      Preliminarily and permanently restraining and enjoining Defendants, their

4   affiliates, subsidiaries, directors, officers, employees, agents and representatives, and

5   all persons acting in concert with or on their behalf, from:

6                i.      developing, or continuing to develop, using, marketing or

7                        commercializing Agile's confidential information and/or trade secrets,

8                        as well as any other products, services or tools that unlawfully rely on,

9                        use or disclose Agile's confidential information and/or trade secrets

10                       without prior authorization of Agile; and/or

11               ii.     disclosing or using any of Agile's confidential information and/or trade

12                       secrets, without prior authorization of Agile;

13               iii.    targeting, soliciting, or attempting to solicit business from any Agile

14                       existing clients or prospective clients for whom Defendants improperly

15                       acquired, accessed, or used confidential Agile information;

16       b.      For Defendants to return all of Agile's confidential information, trade

17   secrets, and property in Defendants' possession, custody or control, and to destroy all

18   additional electronic copies following the return of such information and property;

19       c.      For an injunction against future harm by disclosure or adverse use;

20       d.      For restitution and disgorgement of Defendants' unjust enrichment, in an

21   amount to be proven at trial, or in the alternative, reasonable royalty;

22       e.      For actual damages against Defendants for misappropriation of trade

23   secrets and for the other unlawful and tortious conduct described herein, including in

24   the form of lost profits resulting from the loss of current business and business

25   opportunities that was lost as a result of Defendants' conduct described herein, in an

26   amount to be proven at trial;

27       f.      For an award of punitive damages and/or exemplary damages against

28   Defendants in an amount to be proven at trial;

1         g.     For pre-judgment and post-judgment interest at the maximum legal rate,

2    as applicable, as an element of damages that Agile has suffered as a result of

3    Defendants' wrongful acts;

4         h.     For reasonable attorneys' fees and costs incurred herein as allowed by law;

5    and

6         i.     For such other, further and different relief as the Court deems just and

7    proper.

8    **DEMAND FOR JURY TRIAL**

9         Plaintiff hereby demands a trial by jury on all issues so triable in accordance

10   with Federal Rule of Civil Procedure 38(b).

11

12   DATED: April 30, 2021

13

14                                     **WINSTON & STRAWN LLP**

15                                     By: */s/ Monique Ngo-Bonnici*
                                             Monique Ngo-Bonnici

16                                         Attorneys for Plaintiff
                                           AGILE SOURCING PARTNERS, INC.

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

**Confidentiality and Non-Disclosure Agreement**
for
Agile Sourcing Partners, Inc.

This Non-Disclosure Agreement ("NDA") is made this 23rd day of Sept. 2020, by and between ___Sean Dempsey___ ("Employee") and Agile Sourcing Partners, Inc. ("Agile"). As a material condition of Employee's employment with Agile, and in consideration of Employee's employment with Agile and Employee's receipt of the compensation and other benefits paid or provided to Employee by Agile, Employee agrees as follows:

1. <u>Confidential Information: Ownership of Property/Recipes</u>

(a)    Employee hereby acknowledges the Employee will have access to and will participate in the development of or be acquainted with confidential or proprietary information and trade secrets related to the business of Agile, including, but not limited to: (i) the identity, lists or descriptions of any current, past or prospective clients or customers, referral sources or suppliers; financial statements; marketing plans, initiatives, proposals, presentations and related materials; cost reports or other financial information; contracts, contract proposals or bidding information; business plans, new product developments and proposed service offerings; training and operations methods and manuals; personnel records or information; intellectual property; reports and correspondence; policies and other procedures, including related forms and manuals; (ii) information pertaining to past and present product recipes; (iii) confidential or non-public information relating to business operations, research and development, contracts and strategic plans of third parties with which Agile has or may be assessing commercial arrangements; and (iv) all other tangible and intangible property, which is used in the business and operations of Agile but not made public. The information and trade secrets relating to the business of Agile described hereinabove in this paragraph are hereinafter referred to collectively as the "Confidential Information," provided that the term Confidential Information shall not include any information (A) that is or becomes generally publicly available (other than as a result of violation of this NDA by Employee), or (B) that Employee receives on a non-confidential basis from a source (other than Agile) that is not known by Employee to be bound by an obligation of secrecy or confidentiality to Agile.

(b)    Either during or after the term of Employee's employment with Agile, Employee shall not: directly or indirectly disclose, use, or make known for Employee's or another's benefit any Confidential Information. In the event that Employee is required to disclose Confidential Information under applicable laws or regulations or judicial or administrative proceedings, Employee, prior to any such disclosure, shall provide immediate written notice to Agile sufficient to permit Agile to seek an appropriate protective order or other such remedy, and Employee shall cooperate with Agile in seeking such a protective order or other such remedy. In the event that a protective order or other such remedy is not obtained, Employee may disclose the Confidential Information only to the entity entitled to the Confidential Information in accordance with the legal order and only that portion of the Confidential Information that Employee, when advised by counsel, is legally required to be disclosed.

(c)    Employee shall immediately notify an appropriate officer of Agile of any information which becomes known to Employee which indicates that an unauthorized disclosure or use of Confidential Information may have occurred or is likely to occur.

1

(d)    All Confidential Information disclosed by Agile is and at all times will remain the sole and exclusive property of Agile. Upon Agile's request, or upon termination of Employee's employment with Agile for any reason, Employee shall immediately return to Agile, its successors or assigns (and will not keep in Employee's possession, recreate or deliver to anyone else) all Confidential Information and other Agile property, including but not limited to software, devices (including, but not limited to, laptops, PDAs and other electronic equipment), records, data, notes, reports, proposals, lists, correspondence, specifications, recipes, other documents or property, or reproductions of any aforementioned items, in whatever form maintained (including, without limitation, computer discs and other electronic media). Employee further agrees to cooperate fully with Agile and its representative(s) or designee(s) to ensure that all Confidential Information is removed permanently from Employee's personal electronic devices.

2.  Representations; Acknowledgements.

Employee recognizes and acknowledges that: (i) the nature of Agile's business is highly competitive; (ii) Employee will have access to Confidential Information while performing services as an employee of Agile; (iii) Agile has a compelling and legitimate interest in protecting against the use or disclosure of its Confidential Information and the loss of its customer and client goodwill in the event Employee goes to work for or otherwise renders services to a competitor or an organization or entity attempting or planning to compete with Agile; (iv) the restrictions and limitations set forth in this NDA have been narrowly drafted to protect only the legitimate business interests of Agile; and (v) Employee has signed this NDA knowingly and voluntarily and not as a result of any coercion or duress.

3.  Breach; Injunctive Relief.

If Employee violates any provision of this NDA, Agile shall be entitled to receive from Employee reimbursement for any and all damages caused by such breach, including without limitation, attorney's fees and costs. In addition, Employee hereby expressly acknowledges and agrees that any breach or threatened breach of any provision of this NDA will result in substantial, continuing and irreparable injury to Agile and that a remedy at law for any breach or threatened breach of the provisions of this NDA would be inadequate and, therefore, agrees that Agile shall be entitled to injunctive relief in addition to any other available rights and remedies in cases of any such breach or threatened breach (and Employee hereby waives any requirement that Agile, as applicable, provide a bond or other security in connection with the issuance of any such injunction); provided, however, that nothing contained herein shall be construed as prohibiting Agile from pursuing any other rights and remedies available for any such breach or threatened breach.

4.  Notices.

All notices which are required or may be given pursuant to the terms of this NDA shall be in writing and shall be sufficient in all respects if given in writing and (i) delivered personally, (ii) mailed by certified or registered mail, return receipt requested and postage prepaid, (iii) sent via a nationally recognized overnight courier or (iv) sent via facsimile confirmed in writing to the recipient, if to Agile at Agile's principal place of business, and if to Employee, at Employee's home or business address most recently filed with Agile, or to such other address or addresses as

2

either party shall have designated in writing to the other party hereto, provided, however, that any notice sent by certified or registered mail shall be deemed delivered on the date of delivery as evidenced by the return receipt.

5. Law Governing; Jurisdiction.

This NDA shall be governed by and construed in accordance with the laws of the State of California. Employee herby consents to the personal jurisdiction of the state and federal courts in the State of California for any lawsuit, claim or proceeding arising out of or relating to this NDA.

6. Reformation.

Employee agrees that in the event that any court of competent jurisdiction shall finally hold that any provision of this NDA exceeds the time, geographic scope, or product or service scope permitted by applicable law in any jurisdiction, the provision shall not be rendered void but shall apply with respect to such extent as such court may judicially determine constitutes a reasonable restriction under the circumstances.

7. Severability

If any part of this NDA is held by a court of competent jurisdiction to be invalid, illegible or incapable of being enforced in whole or in part by reason of any rule of law or public policy, such part shall be deemed to be severed from the remainder of this NDA for the purpose only of the particular legal proceedings in question and all other covenants and provisions of this NDA shall in every other respect continue in full force and effect.

8. Waiver.

Failure of Agile to insist upon strict compliance with any of the terms, covenants or conditions hereof shall not be deemed a waiver of such term, covenant or condition, nor shall any waiver or relinquishment of any right or power hereunder at any one or more times be deemed a waiver or relinquishment of such right or power at any other time or times.

9. Entire Agreement; Modifications.

This NDA constitutes the entire and final expression of the agreement of the parties with respect to the subject matter hereof and supersedes all prior agreements, oral and written, between the parties hereto with respect to the subject matter hereof. This NDA may be modified or amended only by an instrument in writing signed by both parties hereto.

10. Survival

The provisions of this NDA shall survive termination of Employee's employment with Agile.

11. Counterparts.

This NDA may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

[Employee Name]

_Sean Dempsey_

Date: _9·23·20_

Agile Sourcing Partners, Inc.

By: _____

Title: _CCO_

Date: _9·23·20_

4